LINDA P. CALHOUN, M.D.; MARK T. MURPHY, M.D.; HEMANTKUMAR PATEL, M.D.; PRAFUL N. PATEL, M.D.; AND J. ROBINSON HARPER, JR., M.D., PLAINTIFFS v. WHA MEDICAL CLINIC, PLLC, DEFENDANT

No. COA05-1345

(Filed 1 August 2006)

**1. Employer and Employee— non-compete agreement—reasonableness a matter of law**

The reasonableness of agreements not to compete is a matter of law, and the trial court did not err by dismissing the jury in a declaratory judgment action to determine the validity of medical non-compete agreements.

**2. Employer and Employee— non-compete agreements—consideration—offer of employment in merged company**

Offers of new employment served as consideration for non-compete agreements where a medical practice became part of a new entity.

**3. Employer and Employee— medical non-compete agreements—no violation of public policy per se**

Non-compete agreements in physicians' employment contracts are not per se against public policy.

**4. Physicians and Surgeons— non-compete agreements—not against public policy**

Medical non-compete agreements were not against public policy where the physicians were able to pay the liquidated damages and had no plans to leave the area.

**5. Appeal and Error— presentation of issues—contention not argued—abandoned**

Plaintiffs abandoned by not arguing an assignment of error that testimony of the purpose of a clause in a medical non-compete agreement was irrelevant.

**6. Appeal and Error— presentation of issues—assignment of error—overbroad**

An overbroad assignment of error did not preserve for appellate review the contention that a finding concerning a medical non-compete clause and AMA ethics was "contrary to law."

**7. Appeal and Error— presentation of issues—assignment of error to conclusion—error not properly assigned to underlying finding**

The appellate court did not consider an assignment of error that concerned only the validity of a medical non-compete agreement notwithstanding an AMA ethics provision where plaintiffs did not properly assign error to underlying finding concerning that provision.

**8. Costs— attorney fees—non-compete agreement—findings not sufficient**

An award of attorney fees under N.C.G.S. § 6-21.2 in a declaratory judgment action determining that a covenant not to compete and a liquidated damages provision in plaintiff doctors' contract of employment were enforceable is remanded for appropriate factual findings where the trial court made no findings as to whether the employment contract is a "printed or written instrument, signed or otherwise executed by the obligor, which evidences on its face a legally enforceable obligation to pay money" or whether the contract relates to commercial transactions within the meaning of the statute.

Appeal by plaintiffs from order entered 10 June 2005 by Judge Kenneth F. Crow in New Hanover County Superior Court. Heard in the Court of Appeals 10 May 2006.

*Ward and Smith, P.A., by Jenna Fruechtenicht Butler and John M. Martin, for plaintiffs-appellants.*

*Nelson, Mullins, Riley, & Scarborough, L.L.P., by Noah H. Huffstetler, III, and Catharine W. Cummer, and Murchison, Taylor, & Gibson, P.L.L.C., by Michael Murchison and Andrew K. McVey, for defendant-appellee.*

CALABRIA, Judge.

Linda P. Calhoun, M.D., Mark T. Murphy, M.D., Hemantkumar Patel, M.D., Praful N. Patel, M.D., and J. Robinson Harper, Jr., M.D.,

collectively ("plaintiffs"), appeal from a declaratory judgment of the trial court, determining a covenant not to compete and a liquidated damages provision were enforceable in an employment agreement between plaintiffs and WHA Medical Clinic, PLLC ("WHA"). We affirm in part and remand in part.

The trial court made, *inter alia,* the following findings of fact:

1. [WHA] is a multi-specialty medical group of approximately 60 physicians who provide both primary and specialty care in southeastern North Carolina.

2. [Plaintiffs] are physicians licensed to practice medicine by the State of North Carolina and are board-certified in cardiology.

3. WHA was formed in 1996 as the successor to Wilmington Health Associates, P.A. ("Wilmington Health"). Prior to 1996, many of the physicians who work for WHA were owners or employees of Wilmington Health.

4. Harper joined Wilmington Health as an employee physician in July 1990 and became a shareholder in August 1993. Calhoun joined Wilmington Health in January 1992 and became a shareholder in January 1994. P. Patel joined Wilmington Health in December 1994 and became a member of WHA in December 1996. Harper, Calhoun, and P. Patel shall be collectively referred to as "Member Plaintiffs."

5. At the time the Member Plaintiffs joined Wilmington Health, their employment agreements included restrictive covenants with liquidated damages provisions that enabled the employee-physician to stay and compete through payment of a fixed sum designed to compensate Wilmington Health for its investment in the physician and the expenses associated with the physician's departure. When Harper and P. Patel originally joined Wilmington Health prior to 1996, they signed such covenants without objection.

6. The benefits of joining an established practice such as Wilmington Health included a guaranteed salary and benefits package, an established patient and referral base, association with well-regarded physicians, staff, facilities, and equipment, licensing and credentialing support, billing, administrative[,] and financial administration.

. . .

8. In August 1996, Wilmington Health and *Phycor Inc.*, a Tennessee physician practice management company, entered into an agreement to sell the assets of Wilmington Health to *PhyCor Inc.* ("Asset Purchase Agreement"). The Asset Purchase Agreement also required WHA, the newly formed entity that employed the physicians formerly employed by Wilmington Health, to enter into a service agreement with *PhyCor of Wilmington*, a subsidiary of *PhyCor Inc.* ("Service Agreement").

9. Simultaneous with the sale of assets, on August 1, 1996, Harper and Calhoun executed individual Payback Agreements, which were separate and distinct from the employment agreements at issue in this case. Pursuant to the Payback Agreements, Harper and Calhoun agreed to return all or a portion of their *PhyCor* payouts if they did not remain with WHA for a period of 4 years commencing August 1, 1996.

10. To protect *PhyCor's* investment in the tangible and intangible assets of Wilmington Health, the Service Agreement required WHA to obtain and enforce restrictive covenants from current and future physician members and employees.

11. The Asset Purchase and Service Agreements further provided that, if an individual physician chose not to enter into the new contracts containing restrictive covenants, the compensation to WHA would be reduced and that individual physician would not receive any share of the *PhyCor* proceeds. At least one physician, Lowell Shinn, chose not to sign the new contract. Dr. Shinn did not receive a payout and the compensation to WHA was proportionately reduced.

12. On August 1, 1996, Calhoun and Harper executed a Member Physician Services Agreement setting forth the terms and conditions of their employment with WHA. A First Amendment to Member Physician Services Agreement was executed on March 25, 1999.

13. In part, Paragraph 13 of the Member Physician Services Agreements provides:

*13.1 Covenant Not to Compete*

*13.1 Physician agrees that during the term of this Agreement and for a period of eighteen (18) months following the termination of employment of Physician with the Company, Physician will not Compete with the Company, as defined*

*below, or employ or solicit the employment of any Restricted Employee, as defined below.*

*13.2 For purposes of this restrictive covenant, the following definitions apply:*

*. . .*

*B. "Restricted Employee" means any person that was an employee of the Company at any time during the twelve (12) months immediately preceding the termination of employment of Physician with the Company.*

*C. "Restricted Territory" means . . . New Hanover, Pender, Brunswick, Onslow, Duplin, Bladen and Columbus Counties if Physician is a subspecialist or other non-primary care physician.*

*. . .*

*13.4 Physician agrees that a breach by Physician of this restrictive covenant would cause irreparable damage to the Company and that, in the event of a breach or threatened breach by Physician, the Company shall be entitled to preliminary and permanent injunctions restraining Physician from breaching or continuing to breach this restrictive covenant.*

*. . .*

*13.8 In the event the Physician desires to practice in violation of this restrictive covenant, Physician shall have the option of paying to the Company the following liquidated damages in advance of practicing in violation of the covenant. Physician shall pay to the Company as liquidated damages an amount equal to the greater of (i) Physician's "average annual income" as shown on the W-2 or K-1 forms prepared by Wilmington Health Associates, P.A. ("WHA") or the Company for the two most recent years preceding termination of Physician's employment, or (ii) Physician's share of the total gross proceeds payable to WHA pursuant to the Asset Purchase Agreement between WHA and PhyCor of Wilmington, Inc. ("PhyCor"), including the amount of any liabilities of WHA assumed by PhyCor pursuant to the Asset Purchase Agreement, and Physician's share of sums payable to the Company pursuant to Article 12 of the Service Agreement.*

14. The liquidated damages provision ensured that physicians who profited from the *PhyCor* transaction were required to repay, at a minimum, the amount of gross proceeds they received under the Asset Purchase and Service Agreements, should they depart and compete with WHA.

15. Such liquidated damages provisions were included because the damage caused by the departure and subsequent immediate competition by physicians depends upon several factors and is difficult to determine in advance. A departing physician's prior net contribution to corporate overhead, the volume of patients and patient revenues lost to the departing physician's new practice, the length of time and cost associated with recruiting replacement physicians, the time it takes a new replacement physician to become a fully productive contributor to the group, and the ability of the remaining physicians in the group to assume the care of patients who wish to remain with the group all affect the extent of WHA's damages.

. . .

17. Each Member Plaintiff had a choice: Either agree to the new contract and receive a payout, or, not agree to the new contract and consequently forego said payout. . . .

18. Plaintiffs Harper, Calhoun, and P. Patel chose to sign the new contract with the restrictive covenants and subsequently received the following individual payouts: Harper received $287,350, Calhoun received $267,171, and P. Patel received $245,730[.]

. . .

20. In December of 1999, WHA hired plaintiff H. Patel, an electrophysiology cardiologist. On December 29, 1999, H. Patel executed an Employee Physician Services Agreement that sets forth the terms and conditions of his employment with WHA. H. Patel began practice at WHA as an employee physician in the summer of 2000.

21. Also in late 1999, WHA hired plaintiff Murphy. On November 23, 1999, Murphy executed an Employee Physician Services Agreement that set forth the terms and conditions of his employment with WHA. Murphy began practice at WHA as an employee-physician in 2000.

CALHOUN v. WHA MED. CLINIC, PLLC

[178 N.C. App. 585 (2006)]

22. Paragraph 17 of the Employee Physician Services Agreement is titled "Restrictive Covenant" and is identical to Paragraph 13 of the Member Physician Services Agreements (the Employee Physician Services Agreements and Member Physician Services Agreements will be collectively referred to as "Employment Agreements"). H. Patel's and Murphy's employment agreements contained the same provisions regarding hiring of "restricted employees" and confidentiality as the Member Physician Services Agreements.

23. In addition, Paragraph 14 of Murphy's and H. Patel's Employee Physician Services Agreements, titled "Compliance with Rules and Regulations," provides in part:

*Physician shall comply with all rules and regulations as may be established and modified by the Managers of Company from time to time pertaining the business and medical practice of Company. Notwithstanding the foregoing, Physician and Company shall be obligated to follow all requirements of local, state, and federal laws and regulations relating to the practice of medicine and treatment of patients and no provision of this Agreement shall be enforceable by Company or Physician or any court of competent jurisdiction where local, state or federal laws and regulations and/or the AMA Code of Professional Ethics prohibits and/or discourages the conduct described in or intent of the provision(s) sought to be enforced.*

24. Diane Atkinson, the Executive Director of WHA, testified that the above provision was included in WHA's employee physician agreements to assuage concerns of potential physician candidates that WHA's contracts gave WHA the power to direct physicians to take unnecessary medical measures. She indicated that this provision was not intended to absolve the restrictive covenant.

25. At the time Murphy and H. Patel executed their Employee Physician Services Agreements and at the time of their departure from WHA, Policy E-9.02 of the AMA Code of Medical Ethics provided: *Covenants-not-to-compete restrict competition, disrupt continuity of care, and potentially deprive the public of medical services. The (AMA) Council on Ethical and Judicial Affairs discourages any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of employment,*

*partnership or corporate agreement.* **Restrictive covenants are unethical *if* they are *excessive* in geographic scope or duration in the circumstances presented, or *if* they fail to make *reasonable* accommodation of patients' choice of physician.**

. . .

28. WHA serves patients from each of the 7 counties reflected in the restrictive covenants, and the Plaintiffs treated patients from all 7 counties.

29. Plaintiffs are all intelligent, well-educated adults who freely and voluntarily entered into their respective Member Physician Services and/or Employment Agreements with WHA. . . .

30. In the fall of 2000, WHA negotiated a termination of its relationship with *PhyCor* and agreed to pay over $8 million to repurchase the rights that *PhyCor* and *PhyCor of Wilmington* had acquired under the Asset Purchase and Service Agreements.

. . .

32. In the summer of 2001, Plaintiffs began meeting to discuss forming a separate cardiology practice in New Hanover County, North Carolina.

. . .

35. [A *pro forma* conducted by a certified public accountant] projected that each Plaintiff could earn approximately one million dollars in their first full year of practice, substantially more than they were earning at WHA. [The accountant] also provided Plaintiffs with an analysis of the after-tax cost of the liquidated damages that the Plaintiffs would owe WHA under Plaintiffs' employment agreement. This analysis showed that the projected increase in the Plaintiffs' earnings would be several times more than required to pay their liquidated damages.

36. On December 3, 2001, Harper met with the remaining WHA cardiologists and WHA's president. The purpose of this meeting was for Harper to inform WHA of Plaintiffs' decision to consider leaving WHA. Plaintiffs had originally planned to meet on the evening of January 8, 2002 and then proceed with terminating their employment with WHA. . . . WHA terminated Harper on January 8, the day before he planned to resign. On January 10,

2002, Calhoun, P. Patel, H. Patel, and Murphy all submitted their ninety-day resignation notice to WHA as required by their respective Employment Agreements.

37. On or about January 10, 2002, the Plaintiffs executed Articles of Organization for their new practice and shortly thereafter executed an Operating Agreement. Also, on or about January 10, 2002, the Plaintiffs executed a "Memorandum of Understanding" for their new practice. Said document includes a covenant that requires any doctor who leaves the practice before April 1, 2005, to continue to pay his or her proportionate share of the expenses through that date.

. . .

39. On or about April 10, 2002, the Plaintiffs opened their cardiology practice in New Hanover County, North Carolina under the name Wilmington Cardiology, PLLC. Without dispute, the Plaintiffs provide physician services in the "Restricted Territory" as defined in their respective agreements with WHA. Plaintiffs have never paid WHA, nor offered to pay WHA, any amount so that the Plaintiffs may compete without violating their Agreements with WHA. However, in response to Judge Jones's April 18, 2002 order, the Plaintiffs have posted a bond in the amount of liquidated damages.

40. Plaintiffs Calhoun, H. Patel, and P. Patel testified at the hearing that they had no plans to leave the area and, if the covenant not to compete was determined to be enforceable, they were prepared to take all necessary steps to ensure continued presence in the medical community and continued treatment of patients, even if that meant paying the liquidated damages agreed to in their contracts with WHA.

41. As required by the April 18, 2002 order, Plaintiffs posted a Letter of Credit with the Clerk of Superior Court of New Hanover County in the amount of One Million Five Hundred Fifty-Nine Thousand Seven Hundred Sixty-Seven Dollars ($1,559,767.00). As a result, Plaintiffs demonstrated the ability to pay the liquidated damages set forth in the restrictive covenant.

. . .

43. Plaintiffs failed to demonstrate they were unable to pay liquidated damages or that they would leave Wilmington or otherwise

cease practicing if they are required to pay the liquidated damages set forth in their respective agreements.

. . .

51. In general, the Plaintiffs comprise a collection of uniquely qualified and talented and skilled physicians. Without dispute, the Plaintiffs provide valuable medical services to a substantial patient base in the "Restricted Area." The Court acknowledges that a Doctor-Patient relationship is a relationship of trust and is developed over time and that patients can be adversely affected if this relationship is disrupted. The Court also acknowledges that a patient's right to choose his own doctor is especially important to the quality of healthcare provided. Patients should have the right to continuity of healthcare by a doctor of their own choosing. Categorically preventing the Plaintiffs from practicing medicine in the "Restricted Area" would cause a substantial health risk to actual and prospective patients in need of the Plaintiffs' services.

52. However, in this case, the Plaintiffs were provided with a simple choice: Pay the liquidated damages and practice in the "Restricted Area;" or, practice in violation of the terms of their respective employment contracts and subject themselves to litigation. The Plaintiffs chose the latter. . . .

53. The liquidated damages set forth in Plaintiff's agreement are conservative compared to the actual damages WHA had already sustained after 12 months of the 18 month restricted period. In the first 12 months since Plaintiffs left WHA to open their competing practice, WHA's cardiology department suffered a decrease in gross professional and ancillary charges of $7.7 million, equating to a $2.9 million decrease in net revenues. Using the departing cardiologists' past net contribution to corporate overhead of 51.6 percent of net collections, the net loss to WHA for this 12-month period alone approximates $1,520,483. Despite aggressive recruiting, it took WHA approximately six months to recruit two replacement cardiologists. As of the trial date, WHA had already expended $128,795 in efforts to recruit replacement cardiologists. Thus, the net losses in the 12-month period from Plaintiffs' departure to the time of trial alone exceed $1,641,278 compared to liquidated damages of $1,587,157.

. . .

57. The amounts stipulated in Plaintiffs' respective agreements as liquidated damages were a reasonable estimate of the damages that would probably be caused by a breach of their covenants.

. . .

59. The amounts stipulated in Plaintiffs' respective agreements as liquidated damages are reasonably proportionate to the damages which have actually been caused by Plaintiffs' breach of their respective covenants.

Based on these and other related findings, the trial court concluded:

2. Plaintiffs' agreements allow them to practice in the "Restricted Area" upon payment of specified liquidated damages and therefore said agreements are not subject to strict scrutiny as to reasonableness and public policy. Nevertheless, said agreements survive a strict scrutiny examination as to reasonableness and public policy.

3. Plaintiffs' agreements are each based on valuable consideration.

4. The enforcement of the liquidated damages provisions in the agreements between Plaintiffs and WHA create no substantial question of potential harm to the public health and consequently said agreements are not void as against public policy.

5. The restrictive covenants contained in the agreements between Plaintiffs and WHA are reasonable as to time and territory restrictions and are based on a legitimate business purpose.

6. The liquidated damages provisions and restrictive covenants contained in the employment agreements of Plaintiffs Murphy and H. Patel are enforceable notwithstanding Policy E-9.02 of the AMA Code of Medical Ethics.

7. The liquidated damages set forth in each of the Plaintiffs' employment agreements with WHA are reasonable in amount and do not constitute a penalty.

8. Each Plaintiff has breached [his or her] respective agreements with WHA by competing with WHA in the restricted area within 18 months of the termination of [his or her] employment.

. . .

10. Plaintiffs are obligated to pay the liquidated damages set forth in their respective employment agreements with WHA. 11. Section 6-21.2 of the North Carolina General Statutes allows for the recovery of attorneys' fees for the failure of Plaintiffs to pay their liquidated damages upon demand from Defendant. In the Court's discretion, the Court determines that the Defendant is entitled to an award of attorney fees.

Plaintiffs appeal.

I. Right to Trial by Jury

[1] We initially address plaintiffs' argument that the trial court erred in dismissing the jury and serving as the finder of fact because plaintiffs had a statutory right to trial by jury on all issues of fact. Plaintiffs instituted this action pursuant to the North Carolina Declaratory Judgment Act, N.C. Gen. Stat. § 1-253, *et seq.* (2005). The Declaratory Judgment Act states, "When a proceeding under this Article involves the determination of an issue of fact, such issue may be determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." N.C. Gen. Stat. § 1-261 (2005). This Court has held, under the Declaratory Judgment Act, the trial court may determine only questions of law absent a waiver of jury trial. *Hall v. Hall*, 35 N.C. App. 664, 665, 242 S.E.2d 170, 172 (1978). The only factual determination of the trial court that plaintiffs challenge in this portion of their brief is that the trial court "made the decisive Findings of Fact on the public policy issue." However, "[s]ince the determinative question is one of public policy, the reasonableness and validity of the contract is a question for the court and not for the jury, to be determined from the contract itself and admitted or proven facts relevant to the decision." *Kadis v. Britt*, 224 N.C. 154, 158, 29 S.E.2d 543, 545 (1944). *See also Farr Assocs. v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000) ("[t]he reasonableness of a non-compete agreement is a matter of law for the court to decide"). Accordingly, the trial court did not err in dismissing the jury, and this assignment of error is without merit.

II. Valuable consideration

[2] Plaintiffs next argue that the trial court erred in concluding that the agreements of Calhoun and Harper were based on valuable consideration. We disagree.

Our standard of review of a declaratory judgment is the same as in other cases. N.C. Gen. Stat. § 1-258 (2005). Accordingly, in a dec-

laratory judgment action where the trial court decides questions of fact, we review the challenged findings of fact and determine whether they are supported by competent evidence. *Insurance Co. v. Allison*, 51 N.C. App. 654, 657, 277 S.E.2d 473, 475 (1981). If we determine that the challenged findings are supported by competent evidence, they are conclusive on appeal. *Finch v. Wachovia Bank & Tr. Co.*, 156 N.C. App. 343, 346-47, 577 S.E.2d 306, 308-09 (2003) (citations omitted). We review the trial court's conclusions of law *de novo. McConnell v. McConnell*, 151 N.C. App. 622, 626, 566 S.E.2d 801, 804 (2002).

Under North Carolina law, covenants not to compete are valid and enforceable if: "(1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *QSP, Inc. v. Hair*, 152 N.C. App. 174, 176, 566 S.E.2d 851, 852 (2002). This Court has held, "the promise of new employment is valuable consideration and will support an otherwise valid covenant not to compete contained in the initial employment contract." *Wilmar, Inc. v. Corsillo*, 24 N.C. App. 271, 273, 210 S.E.2d 427, 429 (1974) (citations omitted). However, "[w]hen the employment relationship is established before the covenant not to compete is executed, there must be separate consideration to support the covenant, such as a pay raise or other employment benefits or advantages for the employee." *Stevenson v. Parsons*, 96 N.C. App. 93, 97, 384 S.E.2d 291, 292-93 (1989) (citations omitted).

When a company buys-out another company and offers that company's personnel an employment contract, the offer of new employment constitutes valuable consideration supporting a restrictive covenant in the employment contract. *QSP, Inc.*, 152 N.C. App. at 178, 566 S.E.2d at 854 ("QSP's buyout, once effective, would have left defendant unemployed but for QSP's offer of employment to defendant and defendant's subsequent acceptance. This offer . . . was an offer of new employment and therefore constituted valuable consideration"). Thus, when WHA, the newly formed entity that employed the physicians formerly employed by Wilmington Health, offered new employment to Harper and Calhoun, this amounted to valuable consideration sufficient to support the restrictive covenants at issue in this case. Since Harper's and Calhoun's covenants not to compete were supported by valuable consideration, WHA's offer of new employment, we need not reach the issue of whether the trial court violated the parol evidence rule in admitting evidence of other consideration supporting the covenants not to compete.

III. Validity of the Covenants Not to Compete

[3] Plaintiffs argue that non-competition provisions in physician employment agreements should be deemed *per se* against public policy. Our courts have long held, covenants not to compete are not *per se* unenforceable, *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 648, 370 S.E.2d 375, 379 (1988), and "medical doctors are by no means immune from such agreements." *Iredell Digestive Disease Clinic, P.A. v. Petrozza*, 92 N.C. App. 21, 30, 373 S.E.2d 449, 454 (1988). *See also Eastern Carolina Internal Med., P.A. v. Faidas*, 149 N.C. App. 940, 945, 564 S.E.2d 53, 56 (2002), *affirmed per curiam*, 356 N.C. 607, 572 S.E.2d 780 (2002). Accordingly, this assignment of error is without merit.

[4] Plaintiffs next argue that "the trial court committed reversible error in concluding as a matter of law that the restrictive covenants were not [strictly scrutinized] as to public policy." "Covenants not to compete restrain trade and are scrutinized strictly." *Kennedy v. Kennedy*, 160 N.C. App. 1, 9, 584 S.E.2d 328, 333 (2003). However, forfeiture clauses are not strictly scrutinized. *Faidas*, 149 N.C. App. at 945, 564 S.E.2d at 56.

In *Faidas*, a panel of this Court held that a provision in an employment contract whereby a physician had to pay a sum of money if he competed against his former employer in three particular counties within one year following his termination of employment was a forfeiture clause rather than a covenant not to compete. *Id.* Judge Wynn argued in dissent,

> the instant case concerns not the forfeiture of future or prospective post-termination benefits paid by the employer, but the required payment by the employee of a large sum to the employer as compensation for 'competing' with the employer. I fail to see a meaningful distinction between the 'Cost Sharing' provision at issue herein and a traditional covenant not to compete coupled with a damages provision for breach thereof, as both involve a restraint of trade based upon a disincentive to compete in the form of damages required to be paid by the former employee.

*Id.*, 149 N.C. App. at 950, 564 S.E.2d at 58-59. On appeal as of right, our Supreme Court *per curiam* affirmed the majority opinion in *Faidas*. 356 N.C. 607, 572 S.E.2d 780 (2002).

Although we note the incongruous results substantively between our facts and the facts of *Faidas*, in form, the provisions at issue in

CALHOUN v. WHA MED. CLINIC, PLLC

[178 N.C. App. 585 (2006)]

this case are a non-compete clause and a damages provision. *See Hudson v. Insurance Co.*, 23 N.C. App. 501, 502, 209 S.E.2d 416, 417 (1974) ("A covenant not to compete, is a provision embodied in an employment contract whereby an employee promises not to engage in competitive employment with his employer after termination of employment"). Paragraph 13.1 of the agreement, stated *supra*, contains an unequivocal non-compete clause, and Paragraph 13.8, *supra*, contains a damages provision "[i]n the event the Physician desires to practice *in violation* [of the non-compete clause]." (Emphasis added). Accordingly, under established case law, the provisions are strictly scrutinized as to reasonableness and public policy. *See Kennedy, supra.*

The trial court concluded, "Plaintiffs' agreements allow them to practice in the 'Restricted Area' upon payment of specified liquidated damages and therefore said agreements are not subject to strict scrutiny as to reasonableness and public policy. Nevertheless, said agreements survive a strict scrutiny examination as to reasonableness and public policy." Plaintiffs challenge the trial court's determination that the restrictive covenants are valid when strictly scrutinized. Specifically, plaintiffs argue, "the undisputed evidence and the trial court's findings of fact nos. 45-51, established that if [plaintiffs] were prevented from practicing medicine, such enforcement not only had the potential to cause, but also actually would cause, substantial harm to public health." We disagree.

The test for determining whether a covenant not to compete violates public policy was set forth in *Petrozza*:

If ordering the covenantor to honor his contractual obligation would create a substantial question of potential harm to the public health, that the public interests outweigh the contract interests of the covenantee, and the court will refuse to enforce the covenant. But if ordering the covenantor to honor his agreement will merely inconvenience the public without causing substantial harm, then the covenantee is entitled to have his contract enforced.

*Iredell Digestive Disease Clinic v. Petrozza*, 92 N.C. App. 21, 27-28, 373 S.E.2d 449, 453 (1988) (citations omitted). This Court considers the following factors in determining the risk of substantial harm to the public: "the shortage of specialists in the field in the restricted area, the impact of . . . establishing a monopoly . . . in the area, including the impact on fees in the future and the availability of a doctor at

all times for emergencies, and the public interest in having a choice in the selection of a physician." *Statesville Medical Group v. Dickey*, 106 N.C. App. 669, 673, 418 S.E.2d 256, 259 (1992) (citations omitted). The trial court made findings 40-44, stated *supra*, that establish that there is no potential harm to public health given that the physicians were able to pay the liquidated damages and had no plans to leave the area. Plaintiffs assign error to these findings as having "no bearing on the issue of whether enforcement of the restrictive covenants creates a substantial question of potential harm to public health." However, the issue of plaintiffs' ability to pay, coupled with their intent to remain in the area even if ordered to pay, directly relates to the issue of whether enforcement of the contract will harm public health. Additionally, the trial court's findings regarding WHA's financial investment and the benefits plaintiffs received from practicing with WHA are not irrelevant since they relate to whether the liquidated damages provision is reasonable in amount.

Given that there is no potential harm to public health on these facts, there is strong public policy in favor of enforcing the provisions at issue:

> [P]ublic policy requires the enforcement of contracts deliberately made which do not clearly contravene some positive law or rule of public morals. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts is to enforce and maintain contracts rather than to enable parties to escape their obligations[.]

*Land Co. v. Wood*, 40 N.C. App. 133, 141, 252 S.E.2d 546, 552 (1979) (internal citation and quotation omitted). For the foregoing reasons, we hold that the trial court did not err in determining that the covenant not to compete at issue was not against public policy and should be enforced.

IV. The Effect of AMA's Code of Medical Ethics on Validity of the Restrictive Covenants

[5] As stated *supra*, Paragraph 14 of H. Patel's and Murphy's employment contract stated, "no provision of this Agreement shall be enforceable by Company or Physician or any court of competent jurisdiction where local, state or federal laws and regulations and/or *the AMA Code of Professional Ethics prohibits and/or discourages the conduct described in or intent of the provision(s) sought to be*

*enforced.*" (Emphasis added). The trial court made findings that relate to the provision as follows:

> 24. Diane Atkinson, the Executive Director of WHA, testified that the above provision was included in WHA's employee physician agreements to assuage concerns of potential physician candidates that WHA's contracts gave WHA the power to direct physicians to take unnecessary medical measures. She indicated that this provision was not intended to absolve the restrictive covenant. 25. At the time Murphy and H. Patel executed their Employee Physician Services Agreements and at the time of their departure from WHA, Policy E-9.02 of the AMA Code of Medical Ethics provided: Covenants-not-to-compete restrict competition, disrupt continuity of care, and potentially deprive the public of medical services. The (AMA) Council on Ethical and Judicial Affairs discourages any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of employment, partnership or corporate agreement. Restrictive covenants are unethical if they are <u>excessive</u> in geographic scope or duration in the circumstances presented, or if they fail to make <u>reasonable</u> accommodation of patients' choice of physician. (Emphasis in original).

Plaintiffs argue that the trial court improperly admitted evidence of the purpose behind including Paragraph 14 in the employment contract. The related assignment of error states, "The Court's Finding of Fact No. 24 in the Order and Final Judgment pertaining to Defendant-Appellee's alleged purpose or intent for including Paragraph 14 in the employment agreements of Drs. Murphy and H. Patel, on the grounds such finding is irrelevant and contrary to the law." In their brief, plaintiffs do not argue that testimony relating to the purpose of Paragraph 14 was irrelevant but rather that the testimony was inadmissible under the parol evidence rule and could not be used to interpret an unambiguous provision of the contract. Since plaintiffs have failed to argue their portion of the assignment of error that stated the testimony was irrelevant, this portion of the assignment of error is abandoned pursuant to N.C. R. App. P. 28(b)(6) (2006).

**[6]** Plaintiffs have also failed to preserve the portion of their assignment of error that stated finding 24 is "contrary to the law." North Carolina Rule of Appellate Procedure 10 states:

> (a) . . . [T]he scope of review on appeal is confined to a consideration of those assignments of error set out in the record on

appeal in accordance with this Rule 10. . . . (c)(1) . . . Each assignment of error shall, so far as practicable, be confined to a single issue of law; and *shall state plainly, concisely and without argumentation the legal basis upon which error is assigned.*

N.C. R. App. P. 10(a), 10(c)(1) (2006) (emphasis added). "Assignments of error that are . . . broad, vague, and unspecific . . . do not comply with the North Carolina Rules of Appellate Procedure." *May v. Down East Homes of Beulaville, Inc.*, 175 N.C. App. 416, 417, 623 S.E.2d 345, 346 (2006). Because the assignment of error at issue states that the challenged finding was "contrary to law" without stating any specific reason that the finding is "contrary to law" it fails to identify the issues briefed on appeal. *See id.* (holding that assignments of error stating that the trial court's rulings were "contrary to the caselaw of the jurisdiction" failed to properly preserve a plaintiffs' arguments for appellate review); *Wetchin v. Ocean Side Corp.*, 167 N.C. App. 756, 759, 606 S.E.2d 407, 409 (2005) ("This assignment—like a hoopskirt—covers everything and touches nothing" (citation and quotations omitted)). Since plaintiffs failed to properly preserve this argument, we do not address it. *See Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 401, 610 S.E.2d 360, 360 (2005) ("The North Carolina Rules of Appellate Procedure are mandatory and failure to follow these rules will subject an appeal to dismissal" (citation and quotations omitted)).

[7] Plaintiffs also argue that the trial court erred in failing to declare *as a matter of law* that the restrictive covenants were unenforceable based on Paragraph 14 and the AMA Code of Medical Ethics. Specifically, plaintiffs contend: 1) Paragraph 14 of the agreement was unenforceable if the AMA Code of Medical Ethics discouraged the provision, and 2) the AMA Code of Medical Ethics discouraged "any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of employment, partnership or corporate agreement." Plaintiffs additionally argue that the contract language was unambiguous and thus a matter of law for the court to decide, citing *Young v. Lumber Co.*, 147 N.C. 20, 31, 60 S.E. 654, 656 (1908). In the applicable assignment of error, plaintiffs fail to assign error to the denial of their motion for summary judgment on this issue or assign error on the basis that the trial court erred in failing to consider this issue as a matter of law. Rather, the assignment of error states,

The Court's Conclusion of Law No. 6 in the Order and Final Judgment that the liquidated damages provisions and restric-

tive covenants contained in the employment agreements of Drs. Murphy and H. Patel are enforceable notwithstanding Policy E-9.02 of the AMA Code of Medical Ethics, on the grounds Paragraph 14 of the employment agreements of Drs. Murphy and H. Patel renders the restrictive covenant void and unenforceable as a result of Policy E-9.02 of the AMA Code of Medical Ethics.

It is significant that plaintiffs did not assign error based on the trial court's failure to determine the issue as a matter of law because, as explained *supra*, plaintiffs have failed to properly assign error to finding 24, regarding the intent behind Paragraph 14 and, thus, finding 24 is binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). Finding 24 establishes that Paragraph 14 "was not intended to absolve the restrictive covenant." Since this finding addresses the issue of the intent behind the provision and is binding on appeal, it supports the trial court's conclusion that "[t]he . . . restrictive covenants contained in the employment agreements of Plaintiffs Murphy and H. Patel are enforceable notwithstanding Policy E-9.02 of the AMA Code of Medical Ethics." Accordingly, given that plaintiffs did not assign error based on the trial court's failure to determine this issue as a matter of law, we do not address this issue on appeal. *See Viar, supra.*

V. Counsel Fees

**[8]** Plaintiffs next argue that the trial court erred in awarding counsel fees to WHA because there is no statutory authority supporting an award of counsel fees on these facts. Specifically, plaintiffs contend that the General Assembly intended N.C. Gen. Stat. § 6-21.2 (2005) to apply to "commercial transactions" and that employer-employee agreements do not amount to a "commercial transaction."[1]

The general rule in this state is "a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute." *Southland Amusements and Vending, Inc. v. Rourk*, 143 N.C. App. 88, 94, 545 S.E.2d 254, 257 (2001) (internal quotations omitted). Defendant contends that statutory authority for counsel fees on these facts arises under N.C. Gen. Stat. § 6-21.2 (2005), which states:

---

1. We note that plaintiffs argue on appeal that the agreement at issue does not fall within the intended scope of N.C. Gen. Stat. § 6-21.2. Plaintiffs make no argument that the agreement at issue otherwise fails to qualify as "evidence of indebtedness," and we do not address this issue.

Obligations to pay attorneys' fees upon any note, conditional sale contract or other evidence of indebtedness, in addition to the legal rate of interest or finance charges specified therein, shall be valid and enforceable, and collectible as part of such debt, if such note, contract or other evidence of indebtedness be collected by or through an attorney at law after maturity . . .

*Id.* In *Enterprises, Inc. v. Equipment Co.*, our Supreme Court considered N.C. Gen. Stat. § 6-21.2 and stated, since the statute is remedial, it "should be construed liberally to accomplish the purpose of the Legislature and to bring within it all cases fairly falling within its intended scope." 300 N.C. 286, 293, 266 S.E.2d 812, 817 (1980). Our Supreme Court further clarified the legislature's intended scope:

Although G.S. 6-21.2 was not itself codified as a constituent section of Chapter 25 of the General Statutes (the Uniform Commercial Code), we believe its legislative history clearly demonstrates that it was intended to supplement those principles of law generally applicable to commercial transactions. As with the Uniform Commercial Code in general, it would appear that some of the purposes underlying the enactment of G.S. 6-21.2 are "to simplify, clarify, and modernize the law governing commercial transactions" among the various jurisdictions, and "to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties . . . ." G.S. 25-1-102(2)(a) and (b).

300 N.C. 286, 293, 266 S.E.2d 812, 817 (1980). Within this framework, our Supreme Court specifically held, "evidence of indebtedness" includes "any printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money." *Enterprises, Inc.*, 300 N.C. at 294, 266 S.E.2d at 817.

Our review of the trial court's order reveals that it made no findings of fact whether the contract at issue is a "printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money" or whether this contract relates to commercial transactions. These determinations are questions of fact that should not be initially decided by this Court. *Eddings v. Southern Orthopedic & Musculoskeletal Assocs.*, 356 N.C. 285, 569 S.E.2d 645 (2002), *per curiam reversing for the reasons stated in* 147 N.C. App. 375, 385, 555 S.E.2d 649, 656 (2001) (Greene, J., dissenting). Accordingly,

we remand this matter to the trial court for appropriate factual determinations.

Plaintiffs have failed to argue their remaining assignments of error on appeal, and we deem them abandoned pursuant to N.C. R. App. P. 28(b)(6) (2006). Because of our resolution of plaintiffs' assignments of error, we need not address WHA's cross-assignments of error.

Affirmed in part; remanded in part.

Judges BRYANT and STEELMAN concur.