**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1063

SEVERN PEANUT CO., INC.; MEHERRIN AGRICULTURE & CHEMICAL
CO.; TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

Plaintiffs – Appellants,

v.

INDUSTRIAL FUMIGANT CO.; ROLLINS INC.,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Elizabeth City. Terrence W.
Boyle, District Judge. (2:11-cv-00014-BO)

Argued: October 27, 2015          Decided: December 2, 2015

Before TRAXLER, Chief Judge, and WILKINSON and DUNCAN, Circuit
Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Chief Judge Traxler and Judge Duncan joined.

**ARGUED**: James Luther Warren, III, CARROLL WARREN & PARKER PLLC,
Jackson, Mississippi, for Appellants. Steven B. Epstein, POYNER
SPRUILL LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF**:
Alexandra Markov, D. Scott Murray, CARROLL WARREN & PARKER PLLC,
Jackson, Mississippi; Jay M. Goldstein, Hunter C. Quick, Howard
M. Widis, QUICK, WIDIS & NALIBOTSKY, PLLC, Charlotte, North
Carolina, for Appellants. Andrew H. Erteschik, POYNER SPRUILL
LLP, Raleigh, North Carolina; William J. Conroy, CAMPBELL TRIAL
LAWYERS, Berwyn, Pennsylvania, for Appellees.

WILKINSON, Circuit Judge:

Appellants Severn Peanut Co. and Severn's insurer allege breach of contract and negligence claims against appellee Industrial Fumigant Co. ("IFC"). According to Severn, IFC improperly applied a dangerous pesticide while fumigating Severn's peanut dome, resulting in fire, an explosion, loss of approximately 20,000,000 pounds of peanuts, loss of business, and various cleanup costs. The District Court for the Eastern District of North Carolina awarded summary judgment to IFC. Because the contract's consequential damages exclusion bars Severn's breach of contract claim, and because North Carolina does not allow Severn to veil that claim in tort law, we affirm the judgment of the district court.

I.

On April 20, 2009, Severn and IFC entered into a Pesticide Application Agreement ("PAA") requiring IFC to use phosphine, a pesticide, to fumigate a peanut storage dome owned by Severn and located in Severn, North Carolina. The PAA required IFC to apply the pesticide "in a manner consistent with instructions . . . and precautions set forth in [its] labeling." J.A. 46.

In return for IFC's services, Severn promised to pay IFC $8,604 plus applicable sales taxes. The contract specified, however, that this charge was "based solely upon the value of

2

the services provided" and was not "related to the value of [Severn's] premises or the contents therein." J.A. 47. The contract also specified that this $8,604 sum was not "sufficient to warrant IFC assuming any risk of incidental or consequential damages" to Severn's "property, product, equipment, downtime, or loss of business." Id.

Phosphine is a pesticide often produced in either tablet or pellet form. Upon reaction with moisture in the air, the tablets or pellets produce a toxic and flammable gas. Phosphine is regulated by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and the North Carolina Pesticide Law of 1971. Both laws require that it be administered only in a manner consistent with its labeling. 7 U.S.C. § 136j(a)(2)(G); N.C. Gen. Stat. § 143-443(b)(3). The product label of the brand of phosphine used by IFC, Fumitoxin, in turn requires that the user avoid piling Fumitoxin tablets up on top of each other when applying the pesticide.

On August 4, 2009, IFC dumped approximately 49,000 tablets of Fumitoxin into Severn's peanut dome through a single access hatch. This caused the tablets to pile up on one another. A fire began on or around August 10, and it continued to smolder despite the parties' firefighting efforts. On August 29 an explosion occurred, and the peanut dome sustained extensive structural damage. After all was said and done, Severn's

3

insurer, plaintiff Travelers Insurance Co., paid Severn over $19 million to cover the loss of nearly 20,000,000 pounds of peanuts, lost business income, the damage to the peanut dome, and Severn's remediation and fire suppression costs.

On January 4, 2012, Severn, its insurer, and its parent company filed an amended complaint against IFC and Rollins Inc., IFC's parent company, in the Eastern District of North Carolina. According to Severn, IFC's improper application of phosphine tablets caused the fire and explosion and gave rise to claims for negligence, negligence per se, and breach of contract. J.A. 41-43. On March 17, 2014, the district court granted partial summary judgment to IFC and Rollins, holding that the PAA's consequential damages exclusion barred Severn's claim for breach of contract. J.A. 1397. Several months later, as the parties were preparing for trial on Severn's remaining negligence claims, the district court sua sponte ordered briefing on the issue of contributory negligence. J.A. 1606. After receipt of the parties' briefs, and on its own motion, the district court found Severn contributorily negligent and awarded summary judgment to IFC and Rollins on Severn's remaining negligence claims. J.A. 1673-76. This appeal, contesting both of the district court's summary judgment orders, followed.

II.

Severn argues that the PAA's consequential damages exclusion does not bar its breach of contract claim for damage to its dome and peanuts and its associated remediation and lost business costs. For the reasons that follow, we disagree.

A.

Before examining the parties' particular consequential damages exclusion, it is worth considering the utility of consequential damages limitations in general. In North Carolina,

> Consequential or special damages for breach of contract are those claimed to result as a secondary consequence of the defendant's non-performance. They are distinguished from general damages, which are based on the value of the performance itself, not on the value of some consequence that performance may produce.

Pleasant Valley Promenade v. Lechmere, Inc., 464 S.E.2d 47, 62 (N.C. Ct. App. 1995) (quoting 3 Dan B. Dobbs, Law of Damages, § 12.4(1) (2d ed. 1993)). While recovery for consequential damages may already be limited by the venerable rule that the victim of a breach of contract may be compensated only for those damages that "may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract," Williams v. W. Union Tel. Co., 48 S.E. 559, 560 (N.C. 1904) (quoting Hadley v. Baxendale, 9 Exch. 341, 354 (1854)), enforcement of explicit contractual provisions allocating the risk of consequential damages to one party or another further

5

maximizes parties' freedom of contract and allows them to better achieve predictability in their business relations.

North Carolina follows a "broad policy" which generally accords contracting parties "freedom to bind themselves as they see fit." Hall v. Sinclair Refining Co., 89 S.E.2d 396, 397-98 (N.C. 1955). Its courts recognize that "the right of private contract is no small part of the liberty of the citizen," and the "usual and most important function of courts" is therefore "to enforce and maintain contracts rather than enable parties to escape their obligations." Calhoun v. WHA Med. Clinic, PLLC, 632 S.E.2d 563, 573 (N.C. Ct. App. 2006) (quoting Tanglewood Land Co. v. Wood, 252 S.E.2d 546, 552 (N.C. Ct. App. 1979)).

Enforcement of contractual liability limitations and damages exclusions is one aspect of this freedom of contract. For this reason, "a person may effectively bargain against liability for harm caused by his ordinary negligence in the performance of a legal duty arising out of a contractual relation." Hall, 89 S.E.2d at 397. And while cases examining damages exclusions and liability limitations often necessarily involve bargains that look like raw deals in hindsight, defense of the liberty of contract requires that courts avoid the "indulgence of paternalism" and respect individuals' "entitle[ment] to contract on their own terms." Gas House, Inc.

v. S. Bell Tel. & Tel. Co., 221 S.E.2d 499, 504 (N.C. 1976) (quoting 14 Williston on Contracts, 3d Ed., § 1632).

Contractual limitations on consequential damages also serve to further predictability in business relations. By allowing parties to bargain over the allocation of risk, freedom of contract permits individuals and businesses to allocate risks toward those most willing or able to bear them. Parties who allocate risks away from themselves thereby cap their future expected litigation and liability costs. Parties assuming risks often receive benefits in the form of lower prices in exchange. Without the ability of contracting parties to protect against the imposition of consequential damages, some consumers might not be able to access needed goods and services at all. Here, for example, while Severn could have pursued a business strategy of hiring its own certified phosphine applicators and doing its pesticide services in-house, it is not clear that it could have found other outside pesticide services companies willing to perform phosphine applications without assent to consequential damages exclusions like those required by IFC.

The benefits of consequential damages limitations for consumers and producers may explain why they are both widespread and widely enforced. In the context of sales of goods and products liability, for instance, North Carolina and many other states follow the Uniform Commercial Code and take the position

7

that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." N.C. Gen. Stat. § 25-2-719. This policy of generally enforcing mutually-assented-to limitations on liability extends beyond the goods context. See, e.g., Hyatt v. Mini Storage on Green, 763 S.E.2d 166, 171 (N.C. Ct. App. 2014) (enforcing contractual exclusion of liability for personal injury encountered on premises of self-storage facility); Lexington Ins. Co. v. Tires Into Recycled Energy & Supplies, Inc., 522 S.E.2d 798, 801 (N.C. Ct. App. 1999) (enforcing lease provision limiting liability for fire damages covered by insurance). Far from an outlandish exculpation of responsibility, consequential damage limitations like that in IFC and Severn's PAA appear to be commonly-enforced tools of doing business used throughout North Carolina and many other states.

B.

Having reviewed North Carolina's background law, we turn to an examination of the particular consequential damages limitation found in Severn and IFC's contract. Severn argues that despite North Carolina's freedom of contract principles, the PAA's particular language is unenforceable on various grounds. We find these contentions unpersuasive.

Severn and IFC are sophisticated commercial entities who entered into an arm's length transaction. Their contract

8

specified that "[t]he amounts payable by [Severn] are not sufficient to warrant IFC assuming any risk of incidental or consequential damages," including risks to several itemized categories of damages: "property, product, equipment, downtime, or loss of business." J.A. 47. The loss of Severn's peanut dome and peanuts, the expenses Severn incurred while handling its burning property, and Severn's lost business unambiguously fall within these itemized categories.

Companies faced with consequential damages limitations in contracts have two ways to protect themselves. First, they may purchase outside insurance to cover the consequential risks of a contractual breach, and second, they may attempt to bargain for greater protection against breach from their contractual partner. Severn apparently did take the former precaution – it has recovered over $19 million in insurance proceeds from a company whose own business involves the contractual allocation of risk. But it did not take the latter one, and there is no inequity in our declining to rewrite its contractual bargain now.

Severn maintains that the PAA's consequential damages exclusion is unconscionable and therefore unenforceable. But North Carolina courts find contracts unconscionable only when "no decent, fairminded person would view the [contract's] result without being possessed of a profound sense of injustice," Gas

House, Inc., 221 S.E.2d at 504 (quoting 14 Williston on Contracts, 3d Ed., § 1632). And only "rarely" are "limitation clauses in transactions between experienced businessmen unconscionable." Stan D. Bowles Distrib. Co. v. Pabst Brewing Co., 317 S.E.2d 684, 690 (N.C. Ct. App. 1984). Here, both parties are experienced businesses, and the contract specifies that the price paid for IFC's fumigation service is not high enough to warrant exposure to consequential damages. A decent fair-minded person may therefore enforce the parties' bargain with conscience intact.

The fact that exculpatory clauses in North Carolina contracts are "not favored" and must be "strictly construed," Fortson v. McClellan, 508 S.E.2d 549, 551-53 (N.C. Ct. App. 1998), does not change our analysis. The whole point of consequential damages limitations is to lift risk from one assenting party and transfer it to another. Were this bargain unconscionable, what limitations on liability would not be? There is no limiting principle to appellants' argument. Parties have no occasion to litigate over contractual provisions limiting liability, after all, unless their ventures have in some way gone awry. If courts are too quick to free harmed parties from the results of their bargains, an erosion of the law's respect for consequential damages limitations would shortly ensue.

Severn's argument that the PAA violates North Carolina public policy is similarly problematic. The federal bench is hardly the ideal pulpit from which to proclaim North Carolina public policy. There is no sound basis to invalidate a North Carolina contract on public policy grounds unless we have a clear supporting signal from the North Carolina courts. "As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify [a federal court's] invalidation of a contract as contrary to that policy." Muschany v. United States, 324 U.S. 49, 66 (1945). Without this sense of caution, there would again be no limit to the contracts we might find policy reasons to invalidate.

Here, it is anything but clear that North Carolina would invalidate this contract on public policy grounds. True, both FIFRA and North Carolina law require that phosphine be applied in a manner consistent with its labeling. 7 U.S.C. § 136j(a)(2)(G); N.C. Gen. Stat. § 143-443(b)(3). But the PAA's consequential damages limitation is not an agreement which "cannot be performed without a violation" of these statutes. Cauble v. Trexler, 42 S.E.2d 77, 80 (N.C. 1947). It is merely a release from private liability. And neither statute specifies private liability as a primary means of enforcement. Instead, federal law provides for a civil fine of up to $5,000 and possible criminal liability for violations of FIFRA's

11

provisions. 7 U.S.C. § 136l. The North Carolina statute similarly allows for criminal liability for violations of its provisions, and also for a civil penalty of not more than $500 against pesticide application businesses when violations are willful. N.C. Gen. Stat. § 143-469. North Carolina also delegates regulatory power to a Pesticide Board, N.C. Gen. Stat. § 143-461(1), and requires all pesticide applicators to be annually licensed with that Board. N.C. Gen. Stat. § 143-452. North Carolina thus furthers pesticide safety by virtue of a comprehensive statutory and regulatory scheme which does not prohibit such pesticide application, but rather requires companies engaging in it to be properly licensed, which IFC concededly was. Adding restrictions to private contracts on top of all this risks an unwarranted infringement on the North Carolina legislature's own public policy role.

Additionally, in North Carolina, the "consideration [of] the comparable positions which the contracting parties occupy in regard to their bargaining strength" is "closely related to the public policy test." Hall, 89 S.E.2d at 398. North Carolina cases invalidating contracts on public policy grounds therefore rarely involve sophisticated business entities – they instead usually involve individual consumers or are grounded in inequalities of bargaining power. See, e.g., Fortson, 508 S.E.2d at 552 (involving "inexperienced member of the public seeking

12

training in the safe use of a motorcycle"); Alston v. Monk, 373 S.E.2d 463, 465 (N.C. Ct. App. 1988) (involving individual customer subjected to "negligent performance of hair styling and coloring services" which "caused her to lose her hair"). We are not presently considering the plight of a vulnerable member of the public adrift among the variegated hazards of a complex commercial world. Instead, we are considering a rather typical agreement among two commercial entities, and we may hold them to the contract's terms.

                                III.

Severn argues that despite its assent to a contractual consequential damages exclusion, its negligence claims should still be allowed to proceed. The district court granted summary judgment to IFC on Severn's negligence claims on the grounds that Severn was contributorily negligent in its efforts to fight the fire after it started. Severn contends that this ruling ignored material issues of fact, making summary judgment on the basis of contributory negligence inappropriate. We agree.

We may, however, "affirm the district court's grant of summary judgment on any ground in the record." Jehovah v. Clarke, 798 F.3d 169, 178 (4th Cir. 2015). Here, we are doubtful that Severn's negligence claims survive its contractual assent to the limitation of its consequential damages. This doubt is reinforced by the principles inherent in North Carolina's

13

economic loss doctrine, which serves as a barrier to certain tort claims arising out of facts best considered through the lens of contract law. We hold that Severn's negligence claims do not survive summary judgment.

North Carolina's economic loss doctrine provides that a breach of contract does not ordinarily "give rise to a tort action by the promisee against the promisor." Ellis v. La.-Pac. Corp., 699 F.3d 778, 783 (4th Cir. 2012) (quoting N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 240 S.E.2d 345, 350 (N.C. 1978)). More specifically, it "prohibits recovery for purely economic loss in tort when a contract, a warranty, or the UCC operates to allocate risk." Kelly v. Ga.-Pac. LLC, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009). In cases arising out of the sale of failed goods, the economic loss doctrine thus bars "recovery for purely economic loss in tort, as such claims are instead governed by contract law." Lord v. Customized Consulting Specialty, Inc., 643 S.E.2d 28, 30 (N.C. Ct. App. 2007).

While it originated out of the law of products liability, North Carolina's economic loss doctrine is based upon broad principles. The rationale for the rule is that "parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective" and that "[t]o give a party a remedy in tort, where the defect in the product damages the actual product, would permit the

14

party to ignore and avoid the rights and remedies granted or imposed by the parties' contract." Moore v. Coachmen Indus., Inc., 499 S.E.2d 772, 780 (N.C. Ct. App. 1998). The economic loss doctrine thus "encourages contracting parties to allocate risks for economic loss themselves, because the promisee has the best opportunity to bargain for coverage of that risk or of faulty workmanship by the promisor." Lord, 643 S.E.2d at 30.

The principles behind North Carolina's economic loss doctrine are applicable to this case, and we are not free to ignore them. Here Severn claims a remedy in tort for IFC's breach of its duty to apply Fumitoxin in accordance with its label – the very same duty as that underlying Severn's breach of contract claim. But Severn chose to bargain away protection for the consequential damages caused by breach of that duty. Its negligence claims therefore attempt to undo that bargain through the vehicle of tort law.

Contrary to Severn's assertions, moreover, its peanuts and storage dome were not "other property" outside of the contract and therefore not subject to the principles of the economic loss doctrine. The contract was for the treatment of "commodities and/or space," and it specified that this included Severn's "1,976,503 [c]ubic [f]eet" of peanuts and its Severn, North Carolina peanut dome. J.A. 46. Severn's complaint in turn acknowledges that the Fumitoxin tablets were placed within the

15

dome and among the peanuts. The pesticide which allegedly caused the fire and the peanuts and dome which that fire allegedly destroyed were therefore at the relevant times both contractually and practically bound up together.

Like a buyer of goods, Severn had the "best opportunity to bargain for coverage of [] risk," Lord, 643 S.E.2d at 30. Yet Severn in fact made just the opposite bargain, and the economic loss doctrine counsels that the contract's allocation of risk in the event of economic and commercial adversity should be respected. Because North Carolina's economic loss principles prevent Severn from transforming its breach of contract claim into tort, we affirm the judgment of the district court.

AFFIRMED

16