IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-431

Filed: 19 March 2019

Wake County, No. 14 CVS 012804

AESTHETIC FACIAL & OCULAR PLASTIC SURGERY CENTER, P.A., Plaintiff,

v.

RENZO A. ZALDIVAR and OCULOFACIAL PLASTIC SURGERY CONSULTANTS, P.A., SURGICAL, LLC, Defendants.

Appeal by plaintiff from order entered 16 December 2015 by Judge G. Bryan Collins, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 16 October 2018.

> *The Law Offices of Michele A. Ledo, PLLC, by Michele A. Ledo; and Law Office of Samuel A. Forehand, P.A., by Samuel A. Forehand, for plaintiff-appellant.*

> *Zaytoun Law Firm, PLLC, by Matthew D. Ballew, John R. Taylor, and Robert E. Zaytoun, for defendants-appellees.*

STROUD, Judge.

This case arises from plaintiff's claim to enforce restrictive covenants in an employment agreement involving two highly specialized physicians. After two years, Dr. Renzo Zaldivar left Aesthetic Facial and Ocular Plastic Surgery Center, P.A., an ocular and facial plastic surgery practice started by Dr. Frank Christenson, and started his own practice. Dr. Zaldivar's employment agreement with Dr. Christensen's practice included a covenant not to compete in certain geographical

areas in North Carolina, and a covenant not to solicit former patients or referrals from individuals or businesses with a referring relationship to plaintiff. After carefully reviewing the covenants, we find that they are unenforceable because they violate public policy and affirm the trial court's grant of summary judgment for defendants.

## I.  Background

Dr. Frank Christensen is a board-certified physician practicing ophthalmology, with specialized "surgical training in ocular and plastic surgery." He has been in practice for about 30 years, and, because of his highly specialized practice, he sees patients "based upon referrals from optometrists and ophthalmologists throughout the eastern half of North Carolina." For most of his years in practice, Dr. Christensen was the only physician working for his practice, Aesthetic Facial & Ocular Plastic Surgery Center, P.A. ("plaintiff"). Plaintiff has an office in Raleigh, but Dr. Christensen saw and treated patients in office spaces rented from other physicians or in hospitals in Central and Eastern North Carolina.

In 2008, Dr. Christensen "actively recruited an additional surgeon to supplement the practice specifically seeking a surgeon trained in both ophthalmic and plastic surgery." "After an extensive recruiting process," he offered to employ defendant, Dr. Renzo Zaldivar. Dr. Zaldivar completed his ophthalmology training and a fellowship with the Mayo Clinic and University of Minnesota, and Dr.

Christensen offered Dr. Zaldivar employment with plaintiff in a letter dated 26 November 2008 ("the Agreement"). This Employment Agreement contained provisions covering salary, benefits, and Dr. Zaldivar's obligations to plaintiff. The Agreement also contained non-compete and non-solicitation covenants. Dr. Zaldivar accepted Dr. Christensen's offer and was employed by plaintiff starting in July of 2009. The Agreement stated Dr. Zaldivar's employment was "at will" but anticipated "continuing year to year thereafter until terminated as provided herein." In June of 2011, Dr. Zaldivar gave notice of his resignation to Dr. Christensen and formed his own practice, defendant Oculofacial Plastic Surgery Consultants, P.A., Surgical, LLC. Dr. Zaldivar immediately began practicing in the same geographical region as plaintiff.

On 24 September 2014, plaintiff filed a complaint against Dr. Zaldivar and his practice ("defendants") alleging claims of breach of the covenants in the employment agreement, tortious interference with contractual relations, civil conspiracy, and unfair and deceptive trade practices. Defendants answered, denying the material allegations of the complaint and alleging that the non-compete covenant and non-solicitation covenants of the Agreement were unenforceable for various reasons. Defendants counterclaimed for breach of contract, fraud, negligent misrepresentation, unjust enrichment, and unfair and deceptive trade practices. After discovery and depositions, defendants filed a motion for summary judgment.

After a hearing on the motion, the trial court entered an order granting defendants' motion. On 12 December 2017, defendants voluntarily dismissed all counterclaims, and plaintiff timely appealed.

## II. Standard of Review

> Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party. If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the presence of a genuine factual dispute for trial.

*In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation and quotation marks omitted).

## III. Restrictive Covenants

Plaintiff argues that the trial court erred in granting summary judgment because there are genuine issues of material fact related to the enforceability of the non-compete covenant and non-solicitation covenant in the Agreement and that the covenants do not not violate public policy. Defendants contend that enforcement of the covenants would create a "substantial question of potential harm to the public health" because Dr. Zaldivar is one of very few specialists in North Carolina who practice his particular subspecialty of ocluofacial plastic surgery.

"[I]n North Carolina, restrictive covenants between an employer and employee are valid and enforceable if they are (1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649-50, 370 S.E.2d 375, 380 (1988). There is no dispute that the parties entered a written employment contract based on valuable consideration; their dispute is based upon the territory and the public policy considerations of the restrictions. Defendants contend that the territorial restrictions of the covenants are unreasonable, and for purposes of addressing the public policy issue, we express no opinion on the reasonableness of the territory. For purposes of this argument, we will view the Agreement in the light most favorable to the plaintiff and assume the restrictions cover the full territory alleged by plaintiff. Dr. Christensen had arrangements with other physicians or hospitals to provide services in Chapel Hill, Durham, Fayetteville, Greensboro, Greenville, Pinehurst, Raleigh, Rocky Mount, Supply, Wake Forest, Wilmington, and Wilson. The Agreement provided that the covenants covered a 15-mile radius around each of plaintiff's practice locations.

a.     Covenant not to Compete

North Carolina courts have considered several cases involving non-compete agreements involving physicians, and depending upon the specialization of the physician and the territory of the restriction, several cases have recognized the

potential for harm to the public health from denial of needed medical care to the public:

> If ordering the covenantor to honor his contractual obligation would create a substantial question of potential harm to the public health, then the public interests outweigh the contract interests of the covenantee, and the court will refuse to enforce the covenant. But if ordering the covenantor to honor his agreement will merely inconvenience the public without causing substantial harm, then the covenantee is entitled to have his contract enforced.

*Iredell Digestive Disease Clinic v. Petrozza*, 92 N.C. App. 21, 27-28, 373 S.E.2d 449, 453 (1988) (citations omitted), *aff'd*, 324 N.C. 327, 377 S.E.2d 750 (1989).

> This Court considers the following factors in determining the risk of substantial harm to the public: the shortage of specialists in the field in the restricted area, the impact of establishing a monopoly in the area, including the impact on fees in the future and the availability of a doctor at all times for emergencies, and the public interest in having a choice in the selection of a physician.

*Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 599-600, 632 S.E.2d 563, 572 (2006) (quotation marks and ellipsis omitted).

Here, both Dr. Zaldivar and Dr. Christensen practice a sub-specialty of oculo-facial surgery. There is no factual dispute there are very few physicians practicing this subspecialty in the territory covered by the restrictions, or even in the entire state of North Carolina.

If a particular type of medical care is readily available in the restricted territory, a covenant which restricts a medical professional from providing care may not offend public policy. For example, in *Jeffrey R. Kennedy, D.D.S., P.A. v. Kennedy*, this Court addressed a general dentist who signed a restrictive covenant not to compete within fifteen miles of the practice in Chapel Hill for three years following his departure from the practice. 160 N.C. App. 1, 4, 584 S.E.2d 328, 330 (2003). The defendant dentist began practicing dentistry in violation of the covenant, and the plaintiff dental practice filed a complaint seeking a preliminary injunction, which the trial court denied. *Id.* at 5, 584 S.E.2d at 331. This Court reversed the trial court and concluded the covenant was enforceable because "the covenant at issue does not cause substantial harm to the public health and, at most, merely inconveniences dental patients." *Id.* at 11, 584 S.E.2d at 335. The evidence in that case showed that many dentists were available in the restricted area, and the defendant dentist did not practice any sort of specialized dental care not provided by most general dentists. *Id.* This Court stated that "[p]rior cases concluding that such restrictions harm the public health involve circumstances wherein the health care provider is the sole such provider in the area, or is one of few specialists in a particular area." *Id.*

This Court addressed a non-compete agreement involving a specialized physician in an area where few similar specialists were available in *Iredell Digestive Disease Clinic v. Petrozza.* 92 N.C. App. 21, 373 S.E.2d 449. In *Iredell Digestive*

*Disease Clinic*, the defendant specialized in gastroenterology and internal medicine. 92 N.C. App. at 22, 373 S.E.2d at 450. Defendant signed a covenant not to compete for three years within twenty miles of Statesville or five miles of any hospital or office serviced by plaintiff. *Id.* at 23, 373 S.E.2d at 450-51. Defendant submitted affidavits from 41 physicians in Statesville which stated that "one gastroenterologist would not be able to meet the community's demand for such services; that losing defendant Petrozza's services would create an excessive workload on plaintiff; and would 'likely result in undesirable and possible critical delays in patient care and treatment.'" *Id.* at 28, 373 S.E.2d at 453. Plaintiff submitted affidavits from 14 physicians who stated "that there are presently four surgeons in Statesville who can perform certain semi-surgical procedures performed by gastroenterologists; and that in severe cases patients can be transferred by helicopter from the hospital in Statesville to Baptist Hospital in Winston-Salem." *Id.* at 28, 373 S.E.2d at 453-54. The trial court acknowledged that "there is conflict between plaintiff's and defendant's affidavits as to the precise impact Dr. Petrozza's leaving would have on the community. However, we believe after reviewing the affidavits *de novo*, that the trial court was correct in finding that the public health and welfare would be harmed if there were only one gastroenterologist in Statesville." *Id.* at 29, 373 S.E.2d at 454.

Similarly, in *Statesville Medical Group v. Dickey*, defendant specialized in endocrinology and signed an employment contract that prohibited him from

competing with plaintiff for two years in Iredell County. 106 N.C. App. 669, 670-71, 418 S.E.2d 256, 257 (1992). The trial court granted a preliminary injunction preventing the defendant from practicing in the restricted area under the covenant. *Id.* at 671, 418 S.E.2d at 257. On appeal, this Court reversed the trial court and found that the covenant posed a risk of substantial harm to the public due to

> the shortage of specialists in the field in the restricted area, the impact of plaintiff establishing a monopoly of endocrinology practice in the area, including the impact on fees in the future and the availability of a doctor at all times for emergencies, and the public interest in having a choice in the selection of a physician.

*Id.* at 673, 418 S.E.2d at 259.

In *Nalle Clinic Co. v. Parker*, defendant specialized in pediatrics and pediatric endocrinology. 101 N.C. App. 341, 342, 399 S.E.2d 363, 364 (1991). Defendant signed a contract with plaintiff that prevented defendant from practicing in Mecklenburg County for two years following his employment with plaintiff. *Id.* After defendant resigned from employment with plaintiff, plaintiff sought a preliminary injunction which the trial court granted. *Id.* at 342-43, 399 S.E.2d at 365. Under the specific facts of the case, including the defendant's specialization and the lack of other pediatric endocrinologists in the geographic area, this Court reversed the trial court because "enforcement of the covenant not to compete would create a substantial question of potential harm to the public health." *Id.* at 345, 399 S.E.2d at 366 (quotation marks omitted).

Here, the covenant not to compete is titled "Restrictive Covenant" in the employment agreement. The covenant provides that for a period of two years after his employment with plaintiff ends, defendant

> will not render any ophthalmology and/or oculo-facial plastic and reconstructive surgery services on behalf of yourself, any business, practice or entity within a fifteen (15) mile radius of any office, satellite or other place of business used by the Practice at the time your employment commences, or within a fifteen (15) mile radius of any future office, satellite or other place of business used by the Practice at the time your employment ends (or within one (1) year prior to the time your employment ends). This promise specifically includes your not practicing ophthalmology and/or oculo-facial plastic and reconstructive surgery services or any of their disciplines at any hospital, surgery center or laser center at which you or the Practice's other physicians had active staff privileges at the time your employment ends (or within one (1) year prior to the time your employment ends).

Dr. Zaldivar resigned in September 2011, and plaintiff did not pursue an injunction to stop Dr. Zaldivar from competing in the restricted area; plaintiff waited until September 2014 to file a complaint. To support their motion for summary judgment, defendants submitted affidavits from eight physicians practicing ophthalmology in North Carolina; six are specialists in oculofacial plastic surgery. These physicians described the medical necessity of Dr. Zaldivar's services and the potential impact on public health from enforcing the restrictive covenants:

> Dr. Zaldivar is a much needed member of the North Carolina medical community. Should Dr. Zaldivar not be permitted to practice in the alleged "restricted area" of the

"non-compete covenant" that is involved in this dispute, this could potentially cause harmful delay in delivery of specialized medical care in the emergency setting . . . . Removing Dr. Zaldivar from practice in this broad and highly populated geographic area would cause an increased burden on the limited number of oculofacial plastic specialists practicing from Greensboro to the North Carolina Coast.

In addition, the eight physicians noted the limited number of oculofacial plastic surgeons in the area:

There are currently a limited number of oculofacial plastic surgeons practicing in the North Carolina from Greensboro to the East Coast. These subspecialty eye surgeons handle emergencies and time-sensitive face and eye surgeries for a population of millions of people in this geographic area, including children seen in emergency rooms for acute or trauma injuries to the eyes and face.

The physicians also noted that Dr. Zalidivar provides several highly specialized surgical procedures not provided by other physicians in the area:

Dr. Zaldivar provides patients with access to highly specialized medical procedures and orbital surgeries, including but not limited to optic nerve sheath fenestrations, which are currently only available in Eastern North Carolina through Dr. Zaldivar's practice. This procedure is usually necessitated in an emergency situation where pressure on the optic nerve can cause permanent vision loss without prompt surgical intervention.

Where defendants have presented evidence supporting a summary judgment motion, plaintiff cannot rely on its complaint but must produce evidence to create a genuine issue of material fact. *See* N.C. Gen. Stat. §1A-1, Rule 56(e) ("When a motion

for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). However, we "view the presented evidence in a light most favorable to the nonmoving party." *In re Will of Jones*, 362 N.C. at 573, 669 S.E.2d at 576.

In response to defendants' motion for summary judgment, plaintiff submitted affidavits of Dr. Christensen and two other employees of plaintiff. In his deposition, Dr. Christensen acknowledged that both he and Dr. Zaldivar are in a very highly specialized area of practice. When Dr. Zaldivar joined plaintiff, Dr. Christensen sent out a letter to his referral sources describing his unique qualifications and extensive training:

> I believe you will be impressed with my new associate Dr. Renzo Zaldivar. He is a very talented surgeon with the highest of training credentials and excellent personal demeanor. Dr. Zaldivar has completed a formal, two-year fellowship in oculoplastics at the Mayo Clinic which is one of thirty recognized by the American Society of Ophthalmic Plastic and Reconstructive Surgery (ASOPRS). . . . *We will be the only fellowship trained oculoplastic and orbital specialists that have both completed a fellowship approved by the American Society of Ophthalmic Plastic and Reconstructive Surgeons and are also members of this society who treat patients in Raleigh and Cary* (Dr. Zaldivar will be admitted to ASOPRS society October, 2009).
>
> . . . .

> I am very excited to have an associate with his excellent credentials. Although results cannot be guaranteed I believe that the first responsibility as a surgeon is to obtain the best and most advanced training available through education and then to apply this knowledge.

(Emphasis added.)

Based upon the entire forecast of evidence, viewed in the light most favorable to plaintiff, there is no genuine issue of material fact as to Dr. Zaldivar's specialized qualifications and the very limited number of physicians in the territory covered by the covenant—or even in North Carolina—who can provide oculofacial plastic surgery and particularly optic nerve sheath fenestrations. Plaintiff seeks to minimize the importance of the optic nerve sheath fenestration surgery, arguing it is "so rare you don't see many of them," but plaintiff does not dispute that when a patient needs optic nerve sheath fenestration surgery, the patient may go blind if the procedure is not performed promptly. And even if very few patients need this procedure, one person losing his or her sight because of the lack of a specialist to perform the surgery is one too many.

There is no genuine issue of material fact regarding the nature of Dr. Zaldivar's practice or the very limited availability of other physicians practicing in the relevant area of North Carolina. We conclude that restricting Dr. Zaldivar's ability to practice in the most populated areas of North Carolina when there are very few oculofacial plastic surgeons, and even fewer who perform some of the specialized procedures he

is trained to provide, raises a "substantial question of potential harm to the public health." *Iredell Digestive Disease Clinic*, 92 N.C. App. at 27, 373 S.E.2d at 453. Accordingly, the covenant violates public policy and will not be enforced.

b.      Buy-Out Provision

Plaintiff contends that even if enforcement of the Agreement by enjoining Dr. Zaldivar from practicing would pose a risk to public health, this risk is not present here because he did not seek to enjoin Dr. Zaldivar from practicing his specialty after leaving plaintiff's practice. Plaintiff waited until after the expiration of the two year covenant to file its claim against defendants and seeks damages under the buy-out provision of the Agreement. This provision provides that

> the Practice agrees to release you from the restrictive covenant of this Paragraph 11 (but not the non-solicitation provisions of Paragraph 12) if you purchase and actually pay for a release from the restrictive covenant from the Practice. Your purchase of a release from the restrictive covenant and your actual payment for such release prior to your practicing in the restricted areas after your employment ends will permit you to practice in the restricted areas described above after termination of your employment. You hereby agree that reasonable compensation to the Practice for such a release from the restrictive covenant is an amount equal to one hundred fifty percent (150%) of your annual base salary in effect immediately prior to the termination of your employment with the Practice. Thus, should you elect to practice in the restricted areas after your employment ends, you agree to pay and the Practice agrees to accept such amount to provide you a release from the restrictive covenant to which you have agreed in this Paragraph 11.

Plaintiff argues that the buy-out provision is enforceable because it does not prevent Dr. Zaldivar from providing medical care; it only requires him to pay Plaintiff to be released from the non-compete provisions of the Agreement (but not the non-solicitation provision, which we will address below).  Plaintiff contends that "[t]his Court has held that there is no potential harm to public health where a physician can pay his former employer to practice in a restricted area, whether the payment provision is cast as a liquidated damages provision or a forfeiture provision."  We disagree with plaintiff's characterization of this Court's prior holdings.

Plaintiff argues this Court approved damages in lieu of enforcement of a non-compete agreement in *Eastern Carolina Internal Medicine, P.A. v. Faidas*. 149 N.C. App. 940, 564 S.E.2d 53, *aff'd*, 356 N.C. 607, 572 S.E.2d 780 (2002).  But *Faidas* did not address a covenant not to compete; this Court held "that the 'Cost Sharing' provision is not a covenant not to compete and we do not subject it to the strict scrutiny as to reasonableness and public policy required with a covenant not to compete." *Id.* at 945, 564 S.E.2d at 56. Relying on *Faidas*, this Court in *Calhoun v. WHA Medical Clinic, PLLC*, considered a non-compete clause and a damages clause dealing with cardiologists and found that "[t]he trial court made findings . . . that establish that there is no potential harm to public health given that the physicians were able to pay the liquidated damages and had no plans to leave the area."  178 N.C. App. at 600, 632 S.E.2d at 573.  At trial, the cardiologists subject to the covenant

testified "that they had no plans to leave the area and, if the covenant not to compete was determined to be enforceable, they were prepared to take all necessary steps to ensure continued presence in the medical community and continued treatment of patients, even if that meant paying the liquidated damages agreed to in their contracts with WHA." *Id.* at 593, 632 S.E.2d at 569. They also posted a letter of credit with the clerk of superior court further demonstrating their ability to pay the liquidated damages. *Id.* Further, the amount of the liquidated damages in *Calhoun* was at a minimum equal to a payout that each doctor had the option to receive or forgo and not be subject to the restrictive covenant. *Id.* at 590, 632 S.E.2d at 567.

Neither *Calhoun* nor *Faidas* stand for the proposition that a damages clause in a restrictive covenant makes a covenant in violation of public policy based upon a risk to public health enforceable through payment of damages instead of enjoining the physician from practicing. The provisions of the Agreement regarding damages in *Calhoun* and the unique facts of that case distinguish it from this case. *See id.* at 600, 632 S.E.2d at 573. *Faidas* did not deal with a covenant not to compete. 149 N.C. App. at 945, 564 S.E.2d at 56. The evidence does not demonstrate that Dr. Zaldivar had the ability to pay the liquidated damages, nor did he post a letter of credit with the clerk of superior court to secure the damages. Both the restrictive covenant *and* the liquidated damages provision must be reasonable and not violate public policy. *See Calhoun,* 178 N.C. App. at 599, 632 S.E.2d at 572 ("[T]he agreement . . . contains

an unequivocal non-compete clause, and . . . contains a damages provision in the event the Physician desires to practice in violation of the non-compete clause. Accordingly, under established case law, the provisions are strictly scrutinized as to reasonableness and public policy." (brackets, quotation marks, and emphasis omitted)).

We recognize that we have the benefit of hindsight, since plaintiff waited until after the two-year term of the restrictions to bring this lawsuit and Dr. Zaldivar continued to practice in the restricted area, so any potential harm to public health from limitation of his practice did not happen. But the timing of plaintiff's lawsuit and the damages provision cannot obviate the public policy considerations of this covenant. If we allowed enforcement of this type of damages provision in lieu of enforcement of an injunction restricting a physician's practice, physicians in Dr. Zaldivar's position may opt not to continue practicing in the restricted area because of the risk of the financial penalty. The practical effect on public health is then the same as enjoining the physician's practice: the public would be denied crucial medical care because of the financial penalty imposed by a physician's non-compete agreement. Since there is a risk of substantial harm to the public based on these facts, there is strong public policy in favor of not enforcing the non-compete provisions by an award of damages.

c.    Non-Solicitation Covenant

Plaintiffs argue that the non-solicitation covenant is enforceable because "the non-solicit provision is reasonably limited to health care providers and patients with whom Christensen Plastics had already established a relationship (or those patients' family members)." The non-solicitation covenant provides:

> Recognizing that your duty to the Practice as your employer extends beyond your employment, you agree that both during your employment and thereafter, if your employment ends (regardless of the reason or manner of termination) and whether or not you practice within the restricted area as described above, that you will not directly or indirectly: (i) solicit for treatment any former or existing patient (or member of any patient's household) of the Practice; (ii) induce or attempt to influence any employee, contractor or patient of the Practice to alter his or her relationship with the Practice in any way; (iii) induce or attempt to influence any hospital, other health care facility, any physician, any optometrist, any optician, or any other professional with a referring relationship with the Practice, including any managed care payor, to alter that relationship in anyway; or (iv) solicit any patient service contractual arrangement of the Practice. This restriction shall apply during the term of your employment and for a period of two (2) years immediately following the end of your employment. In the event of your breach thereof, the two (2) year time limitation expressed above shall be from the date of your last violation.

"To be valid, the restrictions must be no wider in scope than is necessary to protect the business of the employer." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009) (quotation marks omitted). "In North Carolina, the protection of customer relations against misappropriation by a departing employee is well recognized as a legitimate interest of an employer." *Id.*

(quotation marks and brackets omitted). A restrictive covenant may "be directed at protecting a legitimate business interest. But . . . where the Agreement reaches not only clients, but potential clients, and extends to areas where Plaintiff had no connections or personal knowledge of customers, the Agreement is unreasonable." *Hejl v. Hood, Hargett & Assocs.*, 196 N.C. App. 299, 307, 674 S.E.2d 425, 430 (2009).

In his deposition, when Dr. Christensen was asked for the name of a physician whom Dr. Zaldivar solicited in violation of this covenant, he responded:

> I'll give you one doctor. That's the question. Kathy Hecker. He called Kathy Hecker up and says, I would like you to stop sending to Frank and send to me.

But in direct response to this testimony, Dr. Kathryn Hecker swore to the following in an affidavit:

> 2. I have been advised that Dr. Frank Christensen, the owner of Aesthetic Facial & Ocular Plastic Surgery Center, PA, gave sworn deposition testimony about me in his legal proceedings against Dr. Renzo Zaldivar. I have read the portions of Dr. Christensen's depositions where he discusses me, which are attached to affidavit as **Exhibit A**, and Dr. Christensen's testimony about me is false. Specifically, Dr. Christensen's testimony that Dr. Zaldivar solicited business from me is not true. Contrary to Dr. Christensen's testimony, Dr. Zaldivar never called me and asked that I stop referring patients to Dr. Christensen and instead refer patients to Dr. Zaldivar. Also, I never told Dr. Christensen that Dr. Zaldivar solicited me in this way.

This testimony and affidavit could present a genuine issue of material fact, since Dr. Hecker denies that Dr. Zaldivar solicited her, and Dr. Christensen says he

did.  Viewed in the light most favorable to plaintiff, this evidence in addition to the affidavits of plaintiff's employees could show a violation of the non-solicitation agreement as to Dr. Hecker, but even if Plaintiff has forecast one potential violation of the non-solicitation covenant, the Agreement still is unenforceable because it is overbroad and in contravention of public policy.  The non-solicitation provision is not limited to existing patients or Dr. Zaldivar's professional contacts made during his employment with plaintiff.  Instead, it covers "any former or existing patient  (*or member of any patient's household*) of the Practice[.]"   (Emphasis added.)   This restriction would apply not just to existing patients, but also to "any member of the patient's household"—a future or potential patient with whom Dr. Christensen had no relationship—and is therefore unreasonable.  *See Hejl*, 196 N.C. App. at 307, 674 S.E.2d at 430.

Because of the highly specialized nature of both Dr. Zaldivar's and Dr. Christensen's practices, they see patients almost exclusively based upon referrals from other physicians.  The remaining prohibitions of the non-solicitation provisions also impair Dr. Zaldivar's ability to see future or potential patients because it penalizes Dr. Zaldivar for accepting referrals from other medical professionals or hospitals with whom Dr. Christensen had a relationship.   These limitations on Dr. Zaldivar prevent him from

> (ii) induc[ing] or attempt[ing] to influence any employee,
> contractor or patient of the Practice to alter his or her

> relationship with the Practice in any way; (iii) induc[ing] or attempt[ing] to influence any hospital, other health care facility, any physician, any optometrist, any optician, or any other professional with a referring relationship with the Practice, including any managed care payor, to alter that relationship in anyway; or (iv) solicit[ing] any patient service contractual arrangement of the Practice.

For example, if a patient suffered an eye injury and presented to the emergency department of a hospital where Dr. Christensen had practiced, and the hospital contacted Dr. Zaldivar to care for the patient, instead of Dr. Christensen, Dr. Zaldivar may be in violation of the non-solicitation provision simply because he let the hospital know that he was available to care for patients at the hospital and agreed to care for the patient—even if Dr. Christensen was *not available* at that moment to care for the patient in the emergency department. This limitation on referrals from other medical professionals to a highly specialized physician, where very few such physicians are available, would have the same detrimental effect upon availability of medical care as the non-compete agreement, and it is therefore unenforceable.

## IV.    Breach of Contract

Plaintiff argues "[w]here the Referral Source Covenants of the parties' contract are valid and enforceable, the trial court erred in summarily dismissing Christensen Plastics' breach of contract claims." However, the breach of contract claim is contingent on the validity of the unenforceable covenants discussed above. This argument is overruled.

## V.    Learned Profession Exemption

Plaintiff argues that "the trial court erred in holding that the 'learned profession' exemption bars its unfair and deceptive trade practices claim where this claim does not involve the provision of medical services." (Capitalization removed.) Plaintiff's complaint alleged in relevant part:

> 41. Oculofacial P.A. employed Zaldivar for the express purpose of committing acts in breach of his agreement with Plaintiff when Oculofacial P.A. and Zaldivar knew of the agreement and knew or should have known that the acts violated the agreement.

> 42. Oculofacial P.A. and Zaldivar engaged in the solicitation of patients and in the practice of medicine and surgery in North Carolina in violation of the agreement between Plaintiff and Zaldivar.

"To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). "[C]ommerce includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b) (2017) (quotation marks omitted). "To determine whether the learned profession exclusion applies, a two-part inquiry must be conducted: first, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of

professional services." *Wheeless v. Maria Parham Med. Ctr.*, Inc., 237 N.C. App. 584, 589, 768 S.E.2d 119, 123 (2014) (brackets and quotation marks omitted).

"There is no dispute that doctors . . . are members of a learned profession." *Hamlet H.M.A., LLC v. Hernandez*, ___ N.C. App. ___, ___, 821 S.E.2d 600, 606 (2018). Here, the conduct as alleged by plaintiff's complaint is "the solicitation of patients and *the practice of medicine and surgery* in North Carolina in violation of the agreement between Plaintiff and Zaldivar." (Emphasis added.) The Agreement places a limitation on defendant's ability to provide medical care and therefore arises from "a rendering of professional services." *Wheeless*, 237 N.C. App. at 589, 768 S.E.2d at 123. The trial court did not err in determining this claim falls under the learned profession exemption, and this argument is overruled.

## VI. Derivative Claims

Plaintiff next argues that "the Referral Source Covenants are valid and enforceable. As such, they can properly serve as the basis for a tortious interference claim against Zaldivar Plastics." As the restrictive covenants are not enforceable, there is also no basis for plaintiff's tortious interference claim. This argument is overruled.

## VII. Punitive Damages

Plaintiff finally argues, "the trial court . . . erred in holding that Christensen Plastics' punitive damages claim fails." Because we have held that the covenants are

unenforceable, defendants have no liability for compensatory damages, and thus there is no basis for awarding punitive damages. N.C. Gen. Stat. § 1D-15(a) (2017) ("Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages . . . ."); *see Pittmann v. Hyatt Coin & Gun, Inc.*, 224 N.C. App. 326, 330, 735 S.E.2d 856, 859 (2012) ("[A] claim of punitive damages is dependent upon a successful claim for compensatory damages . . . ."). This argument is overruled.

## VIII.    Conclusion

For the foregoing reasons, we affirm the trial court's grant of summary judgment for defendants.

AFFIRMED.

Judges BRYANT and DAVIS concur.